Dolan, P.J.
Plaintiff has appealed from the court’s sua sponte dismissal of seven consolidated actions. Although these were recently filed actions over which the court had both personal and subject matter jurisdiction, we find no error in the court’s sua sponte dismissal.
From the materials available to the court, it appears that defendants are the purchasers of condominium units in a project known as Sherburne Village Condominium. At the time of their original purchase in 1986, defendants executed notes and first mortgages to First American Bankfor Savings (“First American”). Unbeknownst to defendants, First American assigned the notes and mortgages to Hibernia a few *8 months later. First American continued to service the loans, and all of defendants’ communications concerning the loans (e.g., monthly statements, tax forms, tax escrow account statements, etc.) came from First American, bore First American’s name, and contained no reference to the fact that First American was merely the servicing bank.
As part of the purchase of the condominiums, the seller had promised to repair the leaching fields for the property’s septic system. The seller failed to repair the system. The seller then agreed to pay for the transport and dumping of sewage waste from the property. However, by late summer 1989, the seller defaulted on that obligation as well. The condominium owners were faced with the choice of either shutting the premises down and undertaking a major sewer construction project (at a cost of about $1 million) or paying the ongoing cost of the sewage transport.
A meeting of the unit owners was held on October 12,1989 to discuss possible solutions to the septic system failure. A senior vice president of First American, Mr. James Allardice, was in attendance at the meeting. Unit owners questioned how they could conceivably afford to close the property and construct the sewage system — with only 96 units, the $1 million construction cost came to over $10,000 per unit. Furthermore, the construction work would take up to a year, during which time the property would be vacant Unit owners expressed concern that they could not possible continue their mortgage payments under such a scenario.
At that point in the meeting, Mr. Allardice of Fust American spoke. He told the unit owners that the bank would be willing to provide financing for the construction work and that, during the time the buildings were shut down, the bank would reduce the interest rate on the outstanding notes to “little or no interest” Mortgage payments would thus be effectively deferred until after the construction was completed and the buildings were operational again. Mr. Allardice also pointed out that First American itself now owned some eleven units (acquired through foreclosure), that it was in the bank’s own interest to get the construction done as soon as possible, and that the bank would work with the other unit owners on the details of the refinancing to reach an agreement that would be “more than acceptable.”
Apparently relying on Mr. Allardice’s promises of financing for the construction work with “little or no interest" accruing on the outstanding notes and mortgages during the construction period, the unit owners voted unanimously in favor of closing the property and proceedingwith the construction. Notices were sentto all occupants before the end of October, 1989, giving them the required 30-days notice for closing the buildings at the end of November.
On or about November9,1989, Hibernia sent a form letter to the unit owners whose notes it had purchased some three years previously. This was the first communication whatsoever from Hibernia and the first knowledge that defendants had that First American did not hold their notes. In that letter, Hibernia merely informed the unit owners that Hibernia was “in the process of assuming the servicing" of the loan, acknowledged that First American was still functioning as the servicing bank until the servicing transfer was effective, and instructed borrowers to “continue to mail all payments and correspondence” to First American until further notice. The letter did not disclaim any prior representations of First American, and did not disclaim the promises that Mr. Allardice had made (and which the unit owners had apparently already relied on).
Hibernia’s next communication with unit owners was in mid-November, when it sent letters to the owners asking them to come in for individual meetings to discuss “the problems facing our mutual interests at Sherburne Village,” including “the willingness to restructure your debt if necessary.” As unit owners went in to those meetings, Hibernia told them for the first time that it would not honor the moratorium and refinancing package that its servicing agent, First American, had promised. By that time, it was too late for the unit owners to reconsider the vote to close the property. First American was still offering its proposal to the unit owners whose notes it held, *9 but Hibernia was refusing to abide by the financing commitments made by its agent to the unit owners whose notes Hibernia held.
On or about February 27,1990, Hibernia sued First American. In that Verified Complaint, Hibernia recites under oath that First American, acting as Hibernia’s servicing agent, encouraged the unit owners to close the condominium project; that First American “represented to the unit owners that if the Condominium closed, there would be a moratorium on mortgage payments until the Septic System was repaired”; and that First American had never disclosed to unit owners that Hibernia now held their notes. Hibernia’s Verified Complaint included a count for misrepresentation and fraud, based on First American’s failure to inform Hibernia of “the representations made by First American to unit owners that no mortgage payments would be due until the Septic System was repaired”; a count for various breaches of contract, including First American’s “waiving, modifying or consenting to postponements of mortgage payments without Hibernia’s consent”; and a count for various breaches of fiduciary duty, including First American’s vote to close the Property by representing that no further mortgage payments would be due until the Septic System was repaired.
Approximately two weeks after filing the Verified Complaint in Suffolk Superior Court complaining that First American’s actions had made it impossible to enforce or collect on the notes, Hibernia filed the present actions in Quincy District Court, seeking to enforce and collect on those same notes. In its Quincy District Court complaints, motions, affidavits, notices, exhibits, and in its presentation in oral argument for the purpose of obtaining real estate attachments in the full amount due on the promissory notes, Hibernia did not mention, let alone attempt to explain, its contrary sworn statements of just two weeks earlier. Instead, Hibernia filed an affidavit in support of its motion for approval of a real estate attachment, signed under the penalties of peijury by its Vice President, in which it stated that “To the best of my knowledge, defendants have no valid defense to the amount claimed” and that the units on which Hibernia holds mortgages given by defendants to secure the Notes are “worthless.”
At no time has Hibernia indicated that it has any evidence that would explain, change or contradict the import of its prior sworn statement establishing that the defendants’ notes are subject to a moratorium and therefore not in default. At no time has Hibernia attempted to explain why the required expenditure of $10,000 per condominium unit would result in the units becoming “worthless.”
Courts possess inherent powers. One of these powers is the power to prevent vexatious litigation, Boyajian v. Hart, 312 Mass. 264, 266 (1942); another is the power to dismissforunreasonable conduct Monahan v. Washburn, 400 Mass. 126, 128 (1987). Both of these inherent powers are involved in this case.
Prior to bringing these actions, Hibernia had the option of adding the current defendants to its Superior Court action. In fact, these defendants may be necessary parties to establish damages, if any, against First American. In addition, Hibernia had the option of attempting to foreclose its mortgages. Instead, it chose to bring these actions in an additional forum, in order to recover a deficiency on a mortgage note, prior to any determination that a deficiency would exist. The multiplicity of suits, alone, would have justified the motion judge in sua sponte dismissing these actions. Multiple suits are not consistent with the general principle that those who avail themselves of courts of justice for the redress of grievances must proceed in a direct manner by appropriate action in order to accomplish a legitimate result without unnecessary harm or expense to other litigants. Boyajian, supra at 266.
However, the multiplicity of actions was, perhaps, the least concern of the motion judge. In its affidavit Hibernia made two statements, both of which could be construed as attempts to intentionally misrepresent facts to the motion judge. It is not unreasonable to assume that contrary to its assertion in its affidavit, Hibernia knew of a defense available to defendants and did not disclose that defense to the judge. It is also not unreasonable to assume that an expenditure of approximately $10,000 per *10 unit does not render defendants’ condominium units worthless. These statements could be construed as unreasonable conduct that would warrant the sanction of dismissal. When confronted with such apparent misrepresentations, courts have power to dismiss, Monahan, supra at 128.
There is no allegation that the judge did not act with patience or that he did not allow plaintiffs counsel to be heard. In the light of all the circumstances, we think that sua sponte dismissal was an appropriate action in this case, and we find no abuse of discretion by the judge.
Report dismissed.